# CHARLESTON.

## LORD v. LORD.

### Submitted May 1, 1917.   Decided May 15, 1917.

1. DIVORCE—*Grounds—Cruel Treatment—Malignant Threats.*
   Deliberate and malignant threats by one spouse to inflict serious bodily injury upon or take the life of the other, and reasonable probability of execution thereof, entitle the party against whom they are made, to a divorce on either of two grounds, "cruel or inhuman treatment" and "reasonable apprehension of bodily hurt." (p. 551).

2. SAME—*Cruel Treatment—Deliberate and Malignant Threats.*
   Such threats made by one not shown ever to have made a malicious assault or attack upon any person, only in anger and upon provocation, without any actual attempt to execute any of them on any of the numerous occasions affording opportunity therefor, long before severance of cohabitation and against one whose conduct, after notice or knowledge thereof, indicates lack of fear of attempts to carry them into execution, are not deemed to be malignant or dangerous. (p. 551).

3. SAME—*Denial—Custody of Children.*

In a suit for divorce in which the prayer for relief is denied and no divorce granted, there is no jurisdiction to alter the custody of the children of the parties thereto. (p. 553).

Appeal from Circuit Court, Berkeley County.

Bill by Harry P. Lord against Estella Lord for divorce. Decree for defendant, and plaintiff appeals.

*Affirmed.*

*Allen B. Noll, R. H. Boyd,* and *Decatur H. Rodgers,* for appellant.

*A. C. McIntire,* for appellee.

POFFENBARGER, JUDGE:

The bill seeking a decree of divorce in this cause, which the court, on full hearing, declined to grant, alleges matter that may be sufficient to constitute any one of three grounds of divorce, cruel or inhuman treatment, reasonable apprehension of bodily hurt and abandonment or desertion. It was filed by the husband, and, though he left the home and his young son, and the wife and child remained at the home, the circumstances alleged, if true and unqualified or unmitigated by his conduct, justified his severance of cohabitation and might make out a case of legal abandonment and desertion by the wife. It alleged repeated threats by her to take his life by poison and other means, his fear of her execution of such threats and his compulsory severance of the family relation.

Lack of proof of any of the grounds that may be deemed to have been alleged by the narration of facts in the bill relieves from necessity to determine what particular grounds are sufficiently set up.

The wife took a merely defensive position, denying, in her answer, all of paragraph three of the bill, in which the charges were made against her, but admitting her loss of temper on several occasions and threats to cause the plaintiff trouble, if he did not terminate his relations and conduct with one Gertrude Bush, whom she avers she had found in a room with him. She further avers the husband had main-

tained a home for another woman in the city in which the parties resided, at the date of the admitted disturbances, and that, before she had discovered his relations with Gertrude Bush and others, he had infected her with a venereal disease which has greatly impaired her health.

For a considerable period of time before the separation, there was a settled, pronounced and rather notorious lack of harmony in the household. There had been numerous quarrels and unpleasant incidents. As to many of the facts deemed important in the conduct of the cause, each of the parties directly and flatly contradicts the other under oath. Most of the instances of discord are agreed upon, but each denies blame or culpability and imputes it to the other. The wife denies the making of the threats alleged, but several witnesses, some of whom were employees of the husband, swear she made them repeatedly. In the testimony, but not in any pleading, the plaintiff denied that he had ever had any venereal disease and introduced evidence tending to prove the wife had been afflicted with it, before marriage, and still has it in chronic form.

She was the mother of an illegitimate child at the time of her marriage, but there is no proof of any adultery or unchaste conduct on her part, since establishment of the marital relation.

The threats proved were not, as a rule, taken very seriously by those who heard them. One witness says he never communicated them to the plaintiff, because he did not think they would be executed. Another says he brought one of them to his attention in a casual way. Though some of them were boisterous and violent, they occasioned no real alarm. · On one and perhaps two occasions, the wife came to the grocery store of Lord and Lord, owned and operated by the plaintiff and his brother, in the absence of the former, carrying a pistol, inquiring for him and threatening to injure and kill him. There is also evidence of threats to administer poison. She denies all of these threats and also any purpose or intention to do the plaintiff bodily injury. He admits he lived with her for at least six months after he says she told him she would poison him. He kept no poison about the house and

does not know whether she had any there.   All of the threats were made, under the influence of anger and passion. There is no proof of any expression of cool, sedate and deliberate purpose to injure or kill, nor of any actual attempt to do so.   After the threats to shoot him, he went to the house unaccompanied by any guard or protector, on four or five occasions, when she was there and talked with her, and there was neither threat nor attempt to harm him.   On one of these occasions, late at night, he says she wanted him to eat and drink coffee, but he declined, being afraid of poison, but he had come without notice and after long absence.   On what seems to have been the same occasion, she says he left about 6 o'clock in the morning, having declined to eat breakfast, but having drunk a cup of coffee.

In view of the highly contradictory state of the evidence, the court would not be justified in accepting the statments of either party as true, in the instances in which they disagree; but the evidence considered as a whole, fairly proves fault, dereliction of duty and misconduct on the part of both. Though the husband strenuously denies it, he gave the wife a degree of provocation for her outbursts of temper.   She swears she found him in a closed room with the Bush woman, whose reputation for unchastity seems to be established and admitted, at night, at a resturant he had backed financially.   He denies he was there on that occasion, but the man in charge of it and his servant both declined to swear he was not there.   The latter admits he had seen the plaintiff and the Bush woman in there, before the wife came in and scattered the pies and other food over the floor, demolished the dishes and drove him to the kitchen by hurling a piece of ham at him, the former about fifteen minutes, and the latter about a half or three quarters of an hour, before the sudden and unlooked for intrusion.   She says this witness, Casey, was the only person in the dining room, when she entered, and that he was asleep.   Facts and circumstances admitted and proved indicate that the restaurant was a place of questionable character.   A letter from a married woman in Washington, D. C., to the plaintiff, found in his pocket, is strongly suggestive of improper relations between him and this wo-

man. His explanation of the circumstances under which they met and their relations does not agree with the tenor and spirit of the letter. She also produced a postal card from a woman in Baltimore, directed to him, calling him dear friend and purporting to have come from a section of the city, which, she says, bore a very bad reputation in her childhood. His frequent failure to come home at night and to meals, taken in connection with the circumstances just adverted to, were very well calculated to arouse the suspicions the wife professes to have entertained and to which she attributes her loss of temper. He says she refused to get his meals and was uncleanly. She denies this and charges him with lack of provision for meals as well as means of cleanliness.

Cruel and inhuman treatment and apprehension of bodily injury, two of the statutory grounds of divorce, are so closely related that the same state of facts might establish either or both. Mere annoyance or aggravation, however unpleasant, does not constitute either ground. *Goff* v. *Goff,* 60 W. Va. 9, 16; *Huff* v. *Huff,* 73 W. Va. 330; *Lathan* v. *Lathan,* 30 Gratt. 307. It is necessary to go beyond abuse and mistreatment, however shameful, and find an injurious effect or result, jeopardy or impairment of health by destruction of happiness and peace of mind. *Goff* v. *Goff,* cited; *Huff* v. *Huff,* cited; 9 Am. & Eng. Ency. L. 788; 14 Cyc. 599; Nelson, Div. & Sep., sec. 270. Lack of proof of such element, leaves a single remaining inquiry, namely, whether there is proof of reasonable ground to fear bodily injury or death.

It is not necessary to allege or prove an actual attempt to inflict either. *Honliston* v. *Smith,* 2 C. & P. 22; *Graecen* v. *Graecen,* 1 Green Chy. 459; *Breinig* v. *Meitzler,* 11 Harris, Pa. 156; *Beebe* v. *Beebe,* 10 Ia. 133. Words of menace, accompanied by a probability of bodily violence, suffices. *Whispell* v. *Whispell,* 4 Barb. (N. Y.) 217; *Beebe* v. *Beebe,* 10 Ia. 133. When the words of threat are the expression of determined malignity, and there is reasonable ground to apprehend that they will be carried into effect, they constitute a sufficient ground for divorce.

The element of malignancy in the threats proved is nega-

tived by two or three facts. They were always made in the heat of passion. It cannot be assumed that they would have been made under other circumstances. There was provocation on the part of the husband. The wife may have been jealous, without cause, on numerous occasions, as the plaintiff charges, but there was enough in his conduct to afford solid ground and reason for suspicion sufficient to arouse anger. It is not unreasonable to hold the husband of a jealous wife to a higher degree of circumspection than would be necessary to the maintenance of peace and harmony, in the absence of such circumstance. In subjecting himself to the marriage relation, he necessarily surrendered a portion of his liberty, selected his life companion and bound himself to such a degree of self-denial and sacrifice as may reasonably be deemed to have been contemplated; and, if the peculiar trait of character or disposition requiring larger sacrifices than were expected, was not discovered before marriage, the existence thereof is neither a ground for divorce nor justification for omission of duty to avoid or prevent trouble and discord, by the adoption of such a course of conduct as is reasonably necessary and practicable. But for the provocation given, the threats might never have been made. It cannot be safely nor reasonably assumed that threats made on provocation would have been made without it. Threats of the character of those complained of were made long before this suit was instituted and the defendant never availed herself of the numerous opportunities she has had, for carrying them into execution. If she had had sedate purpose to shoot him, she would almost certainly have attempted it, on some of the occasions on which he came to the house unprotected, or at the store at which she could have found him often. Likewise she neglected many opportunities to poison him.

Moreover, other circumstances tend to prove absence of fear or belief on the part of the plaintiff, that she would attempt to carry the threats into execution. According to his own statement under oath, he went to the house unprotected several times, after he had professedly broken off cohabitation. For months after he says she had threatened to poison him, he remained with her.

Though she is impetuous, high-tempered and violent in anger, there is no proof that she ever actually attacked any human being with a weapon more dangerous than a piece of ham and that had not been selected premeditatedly nor with malice aforethought. She never attacked the plaintiff in any of her fits of temper, nor attempted to do so. He says she did strike the child with some sort of a missile, but admits she had thrown it at a cat and not at the child.

It is hardly necessary to say alleged neglect of the child would not be ground for divorce, if proved.

The statute confers no authority upon the court to disturb the custody of the child or children of the parties to a divorce suit, on its refusal to decree a divorce. If the divorce is awarded, it may do so. Code, ch. 64, sec. 11. A similar statute in New York has been construed as not authorizing it, when the prayer of the bill is refused. *Davis* v. *Davis,* 75 N. Y. 221. There is a like holding in *Keppel* v. *Keppel* (Ga.), 17 S. E. 976. These decisions were rendered in code practice states in which procedure is supposed to be more liberal than it is here. As the New York court observes, it would be an anomaly in legal proceedings to allow a complainant, who had failed to establish a claim to the principal relief sought, to have a decree against the defendant for the mere incidents of that relief. To award the custody of the child to the husband, under such circumstances, would be inconsistent with the decision on the merits. It would tend to prevent reconciliation and resumption of cohabitation, favored and enforced by the law, as far as is reasonably practicable. To refuse a divorce, in obedience to this policy, on the one hand, and take the child or children, constituting the strongest tie between the parties, from one of them in disregard thereof, on the other, and in the same breath, would be both inconsistent and destructive of declared policy. It would necessarily involve the extension of judicial aid in the maintenance of separation and establishment of cause for divorce.

Perceiving no error in the decree complained of, we will affirm it.

*Affirmed.*